1  Christopher  Campanella
2  309 Phillips Road
3  Valley Falls  NY 12185
4  Phone: 858 217 3384

U.S. DISTRICT COURT
N.D. OF N.Y.
**FILED**

JUN 1 1 2010

5        UNITED STATES DISTRICT COURT LAWRENCE K. BAERMAN, CLERK
6        NORTHERN DISTRICT OF NEW YORK            ALBANY

**Christopher  Campanella**

Plaintiff,

vs.

**BAC HOME LOANS SERVICE, LP**

Defendant

Case #   **10 -CV- 0683**

GTS **/ DRH**

**ORIGINAL PETITION AND**
**PETITION FOR RESTRAINING**
**ORDER**

7

8                                      Date: 6/11/10

9   Comes now   Christopher   Campanella , hereinafter referred to as "Petitioner," and
10  moves the court for relief as herein requested:

11                              **PARTIES**
12  Petitioner is    Christopher  Campanella , 309 Phillips Road  Valley Falls , NY  12185.

13  Currently Known Defendant(s) are/is: BAC Home Loans Servicing, LP, PO Box 660694. Dallas
14  TX, 75266

15                        **STATEMENT OF CAUSE**
16  Petitioner, on the 5th day of June, 2008, entered into a consumer contract for the refinance of a
17  primary residence located at  Christopher   Campanella , 309 Phillips Road  Valley Falls ,  NY
18  12185, hereinafter referred to as the "property."

19  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a
20  predatory loan agreement with Defendant.

21  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
22  crafted scheme intended to defraud Petitioner.

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        1 of 26

23    Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
24    of the types of tactics used by Defendants to defraud Petitioner.

25    Defendants charged false fees to Petitioner at settlement.

26    Defendants used the above referenced false fees to compensate agents of Petitioner in order to
27    induce said agents to breach their fiduciary duty to Petitioner.

28    Defendant's attorney caused to be initiated collection procedures, knowing said collection
29    procedures in the instant action were frivolous as lender is estopped from collection procedures,
30    under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
31    the production of the original promissory note alleged to create a debt.

32                                        **IN BRIEF**
33                          *(Non-factual Statement of Posture and Position)*

34     It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
35    making a number of allegations that, outside the context of the current condition of the real
36    estate industry, may seem somewhat outrageous and counter-intuitive.

37    When Petitioner accuses ordinary individuals of acting in concert and collusion with an
38    ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
39    unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
40    people, just doing what they have been trained to do, are out to swindle the poor
41    unsuspecting borrower.

42    The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
43    committed by people acting in concert and collusion, one with the other.  Petitioner has no
44    reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
45    that what they were doing was part of an ongoing criminal conspiracy, only that it was,
46    and they, at the very least, kept themselves negligently uninformed of the wrongs they
47    were perpetrating.

48    Petitioner maintains that the real culprit is as much the system itself, including the courts,
49    for failure to strictly enforce the protections that remain in place in order to give lenders
50    good cause to exercise care in their dealings with unsuspecting consumers.

51                          **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
52                             *(General State of the Real Estate Industry)*
       ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER            2 of 26

53    ***THE BEST OF INTENTIONS***

54    Prior to the 1980's and 1990's ample government protections were in place to protect the
55    consumer and the lending industry from precisely the disaster we now experience.
56    President Clinton's administration, under the guise of making housing available to the
57    poor, primary protections were relaxed which had the effect of releasing the money
58    changers on us all.

59    Under the pre-existing, carefully crafted monetary scheme, Lenders created loans then
60    they then stood the risk for said loan, and most Americans were, consequently, engaged in
61    safe and stable home mortgages.  With the protections removed, the money changers
62    swooped in and, instead of making loans available to the poor, they used the opportunity to
63    convince the unsophisticated American public to do something that had been essentially
64    taboo; they were convinced to speculate with their most important investment, their
65    homes.

66    BAC Home Loans Servicing, Ameriquest, Country Wide, and many others swooped in
67    and convinced Americans to sell their homes, get out of the safe mortgage agreements, and
68    speculate with the equity by purchasing homes they could not afford.  Lenders created
69    loans intended to fail as, under the newly crafted system, the Lender profited more from a
70    mortgage default than from a stable loan.

71    Companies cropped up who called themselves banks when, in fact, they were only either
72    subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
73    creating and selling promissory notes.  These companies then profited from the failure of
74    the underlying loans.

75    ***HOW IT WORKS***

76    Briefly, how it works is this, the Lender would secure a large loan from a large bank,
77    convert that loan into 20 and 30 year mortgages, then sell the promise to pay to an
78    investor.

79    An agent, usually a Agent, would contract with a seller to find a buyer, then bring both
80    seller and buyer to a lender who would secure the title from the seller using the funds
81    borrowed for that purpose then trade the title to the buyer in exchange for a promise to pay
82    a certain amount over a stipulated term.  The lender, however, has created a 20 or 30 year
83    mortgage with money the lender must repay within 6 months, therefore, as soon as the

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          3 of 26

84 closing is consummated, the promissory note is pooled together with others and sold to an
85 investor.

86 Using the instant case as an example, a $280,000.00 note at 6.8180% interest over 30
87 years will produce $666,048.55 The lender can then offer up the security at say 50% of
88 the future value to the investor. The investor will, over the life of the note, less
89 approximately 3.00% servicing fees, realize $323,033.55 . The lender can then pay back
90 the bank and retain a handsome profit in the amount of $63,015.00. The lender, however,
91 is not done with the deal.

92 The lender signed over the promissory note to the investor at the time of the trade, did not
93 sign over the lien document. The State of Kansas Supreme Court addressed this issue and
94 stated that such a transaction was certainly legal, however, it created a fatal flaw in that,
95 the holder of the lien document, at time of sale of the security instrument, received
96 consideration in excess of the lien amount, and therefore, the lender could not be harmed
97 and the lien became a void document.

98 This begs a question, if keeping the lien would render it void, why would the lender not
99 simply transfer the lien with the promissory note? As always, follow the money. The
100 lender will hold the lien for three years, file an Internal Revenue Form 1099a, claim the
101 full amount of the lien as abandoned funds, and deduct the full amount from the lender's
102 tax liability. The lender, by this maneuver, gets consideration a second time and still the
103 lender is not done profiting from the deal.

104 After sale of the promissory note, the lender remains as the servicer for the investor. The
105 lender will receive 3% of each payment the lender collects and renders to the investor
106 pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
107 that amount. Also, if the loan defaults, the lender stands to gain a considerable amount for
108 handling the foreclosure.

109 The lender stands to profit far more from a note that is overly expensive in the first
110 instance, then slow to pay in the second, then ultimately fails in the third, than from good
111 stable loan. And where, you may ask, does all this profit come from? It comes from the
112 equity the lender convinced the borrower to invest in the new purchase, and still the lender
113 is not finished profiting from the deal.

114 The last nail was driven in the American financial coffin on the last day of the Congress in
115 2000 when they removed a restriction that had been in place since the economic collapse

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        4 of 26

116   of 1907.  At that time, investors were allowed to bet on stocks without actually buying
117   them.  This unbridled speculation lead directly to an economic collapse so the legislature
118   banned the practice, until the year 2000.  The money changers got their way on the last
119   day, the last act of the session, when congress opened the process against and it took only
120   8 years to crash the stock market again.

121   The lender was not done profiting from the loan he created as he was then free to bet on
122   the failure of the security.

123   The unsuspecting consumer was lulled into accepting the pronouncements of the Agent
124   agents, the lenders, appraiser, underwriters, and trustees as all were acting under the cover
125   of government regulation.  Unfortunately, the regulations in place to protect the consumer
126   from just this kind of abuse were simply being ignored.

127   The loan origination fee from of the HUD1 settlement statement is the finder's fee paid for
128   the referral of the client to the lender by  a person acting as an agent for the borrower.
129   Hereinafter, the person or entity who receives any portion of the yield spread premium, or
130   a commission of any kind consequent to securing the loan agreement through from the
131   borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
132   law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
133   seeking out a lender for the borrower, would seek the best deal for his client rather than
134   who would pay him the most.  That was the intent, but not the reality.  The reality is that
135   Agents never come away from the table with less than 2% or 3% of the principal.  This is
136   accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
137   fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
138   product that the borrower qualifies for.  This will generate more profits for the lender and,
139   consequently, for the Agent.

140   It was a common practice for lenders to coerce appraisers to give a higher appraisal than is
141   the fair market price.  This allows the lender to increase the cost of the loan product and
142   give the impression that the borrower is justified in making the purchase.

143   The lender then charges the borrower an underwriting fee in order to convince the
144   borrower that someone with knowledge has gone over the conditions of the note and
145   certified that the meet all legal criteria.

146    The entire loan process is a carefully contrive connivance designed and intended to induce
147    the unsophisticated borrower into accepting a loan product that is beyond the borrowers
148    means.

149    The trustee, at closing, participates actively in the deception of the borrower by placing
150    undue stress on the borrower to sign the large stack of paperwork without reading it. The
151    trustee is, after all, to be trusted and has been paid to insure the transaction. This trust is
152    systematically violated for the purpose of taking unfair advantage of the borrower.

153    With all this, it should be a surprise to no one that this country is having a real estate crisis.

154                          **PETITIONER WILL PROVE THE FOLLOWING**

155    Petitioner is prepared to prove, by a preponderance of evidence that:

156    Lender has no legal standing to bring collection or foreclosure claims against the property;

157    Lender is not a real party in interest in any contract which can claim a collateral interest in
158    the property;

159    even if Lender were to prove up a contract to which Lender had standing to enforce against
160    Petitioner, no valid lien exists which would give Lender a claim against the property;

161    even if Lender were to prove up a contract to which Lender had standing to enforce against
162    Petitioner, said contract was fraudulent in its creation as endorsement was secured by acts
163    of negligence, common law fraud, fraud by non-disclosure, fraud in the inducement, fraud
164    in the execution, usury, and breaches of contractual and fiduciary obligations by
165    Mortgagee or "Trustee" on the Deed of Trust, "Mortgage Agents," "Loan Originators,"
166    "Loan Seller," "Mortgage Aggregator," "Trustee of Pooled Assets," "Trustee or officers of
167    Structured Investment Vehicle," "Investment Banker," "Trustee of Special Purpose
168    Vehicle/Issuer of Certificates of 'Asset-Backed Certificates,'" "Seller of 'Asset-Backed'
169    Certificates (shares or bonds)," "Special Servicer" and Trustee, respectively, of certain
170    mortgage loans pooled together in a trust fund;

171    Defendants have concocted a carefully crafted connivance wherein Lender conspired with
172    Agents, et al, to strip Petitioner of Petitioner's equity in the property by inducing Plaintiff
173    to enter into a predatory loan inflated loan product;

174    Lender received unjust enrichment in the amount of 5% of each payment made late to
175    Lender while Lender and Lender's assigns acted as servicer of the note;

176    Lender and Lender's assigns, who acted as servicer in place Lender, profited by handling
177    the foreclosure process on a contract Lender designed to default;

178    Lender intended to defraud Investor by converting the promissory note into a security
179    instrument and selling same to Investor;

180    Lender intended to defraud Investor and the taxpayers of the United States by withholding
181    the lien document from the sale of the promissory note in order that Lender could then
182    hold the lien for three years, then prepare and file Internal Revenue Form 1099a and
183    falsely claim the full lien amount as abandoned funds and deduct same from Lender's
184    income tax obligation;

185    Lender defrauded backers of derivatives by betting on the failure of the promissory note
186    the lender designed to default;

187    Participant Defendants, et al, in the securitization scheme described herein have devised
188    business plans to reap millions of dollars in profits at the expense of Petitioner and others
189    similarly situated.

190                           **PETITIONER SEEKS REMEDY**
191    In addition to seeking compensatory, consequential and other damages, Petitioner seeks
192    declaratory relief as to what (if any) party, entity or individual or group thereof is the
193    owner of the promissory note executed at the time of the loan closing, and whether the
194    Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
195    Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
196    alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

197    *PETITIONER HAS BEEN HARMED*

198    Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

199    Such harm and detriment includes economic and non-economic damages, and injuries to
200    Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

201    In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
202    equitable relief requested herein is granted.

### STATEMENT OF CLAIM

203

### *DEFENDANTS LACKS STANDING*

204

**No evidence of Contractual Obligation**

205

206 Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
207 produce said contract. Even if Defendants produced evidence of the existence of said contract in
208 the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
209 that a contract actually existed at one point in time. A copy, considering the present state of
210 technology, could be easily altered. As Lender only created one original and that original was
211 left in the custody of Lender, it was imperative that Lender protect said instrument.

212 In as much as the Lender is required to present the original on demand of Petitioner, there can be
213 no presumption of regularity when the original is not so produced. In as much as Lender has
214 refused Petitioner's request of the chain of custody of the security instrument in question by
215 refusing to identify all current and past real parties in interest, there is no way to follow said
216 chain of custody to insure, by verified testimony, that no alterations to the original provisions in
217 the contract have been made. Therefore, the alleged copy of the original is only hearsay
218 evidence that an original document at one time existed. Petitioner maintains that, absent
219 production of admissible evidence of a contractual obligation on the part of Petitioner,
220 Defendants are without standing to invoke the subject matter jurisdiction of the court.

**No Proper Evidence of Agency**

221

222 Defendants claim agency to represent the principal in a contractual agreement involving
223 Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
224 pronouncement that agency has been assigned by some person, the true identity and capacity of
225 whom has not been established. Defendants can hardly claim to be agents of a principal then
226 refuse to identify said principal. All claims of agency are made from the mouth of the agent with
227 no attempt to provide admissible evidence from the principal.

228 Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
229 court.

230    **Special Purpose Vehicle**

231    Since the entity now claiming agency to represent the holder of the security instrument is not the
232    original lender, Petitioner has reason to believe that the promissory note, upon consummation of
233    the contract, was converted to a security and sold into a special purpose vehicle and now resides
234    in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue
235    Code and as such, cannot be removed from the REMIC as such would be a prohibited
236    transaction.    If the mortgage was part of a special purpose vehicle and was removed on
237    consideration of foreclosure, the real party in interest would necessarily be the trustee of the
238    special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a
239    special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
240    cause to believe defendant is not the proper agent of the real party in interest.

241    *CRIMINAL CONSPIRACY AND THEFT*

242    Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
243    a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of
244    negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
245    acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
246    Petitioner by Lender, which were then used to fund the improper payment of commission fees to
247    Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

248    *AGENT PRACTICED UP-SELLING*

249    By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so
250    doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
251    that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose
252    Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to
253    Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
254    connivances, wherein Agent proactively made knowingly false and misleading statements of
255    alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
256    Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
257    a loan product offered by the Lender.  Said loan product was more expensive than Petitioner
258    could legally afford. Agent acted with full knowledge that Petitioner would have made a
259    different decision had Agent given complete disclosure.

260 ***FRAUDULENT INDUCEMENT***

261 Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
262 known, Petitioner could not afford in order to unjustly enrich Lender.

263 ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

264 Said more expensive loan product was calculated to produce a higher return when sold as a
265 security to an investor who was already waiting to purchase the loan as soon as it could be
266 consummated.

267 **Extra Commission for Late Payments**

268 Lender acted with deliberate malice in order to induce Petitioner into entering a loan agreement
269 that Lender intend Petitioner would have difficulty paying. The industry standard payment to the
270 servicer for servicing mortgage note is 3% of the amount collected. However, if the borrower is
271 late on payments, a 5% late fee is added and this fee is retained by the servicer. Thereby, the
272 Lender stands to receive more than double the regular commission on collections if the borrower
273 pays late.

274 **Extra Income for Handling Foreclosure**

275 Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
276 on which Lender intend petitioner to default on.

277 In case of default, the Lender, acting as servicer, receives considerable funds for handling and
278 executing the foreclosure process.

279 **Credit Fault Swap Gambling**

280 Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
281 fault swap derivatives. Since Lender designed the loan to fail, betting on said failure is
282 essentially a sure thing.

283 ***LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN***

284 Lender sold the security instrument immediately after closing and received consideration in an
285 amount in excess of the lien held by Lender.

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER     10 of 26

286  Since Lender retained the lien document upon the sale of the security instrument, Lender
287  separated the lien from said security instrument, creating a fatal and irreparable flaw.

288  When Lender received consideration while still holding the lien and said consideration was in
289  excess of the amount of the lien, Lender was in a position such that he could not be harmed and
290  could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

291  Since the separation of the lien from the security instrument creates such a considerable concern,
292  said separation certainly begs a question: "Why would the Lender retain the lien when selling the
293  security instrument?"

294  When you follow the money the answer is clear.  The Lender will hold the lien for three years,
295  then file and IRS Form 1099a and claim the full amount of the lien as abandoned funds and
296  deduct the full amount from Lender's tax liability, thereby, receiving consideration a second
297  time.

298  Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
299  lien to the holder of the security, however, the lien once satisfied, does not gain authority just
300  because the holder, after receiving consideration, decides to transfer it to someone else.

301  ### *LENDER PROFIT BY CREDIT FAULT SWAP DERIVATIVES*

302  Lender further stood to profit by credit fault swaps in the derivatives market, by way of inside
303  information that Lender had as a result of creating the faulty loans sure to default.  Lender was
304  then free to invest on the bet that said loan would default and stood to receive unjust enrichment
305  a third time.  This credit default swap derivative market scheme is almost totally responsible for
306  the stock market disaster we now experience as it was responsible for the stock market crash in
307  1907.

308

309

310

311

312

313     ***LENDER CHARGED FALSE FEES***

314     Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real

315     Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party

316     vendor.

317     Lender charged other fees that were a normal part of doing business and should have been

318     included in the finance charge.

319     Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time

320     did Lender or Trustee provide documentation to show that the fees herein listed were valid,

321     necessary, reasonable, and proper to charge Petitioner.

| | | |
|---|---|---:|
| 803 | Appraisal | $410.00 |
| 804 | Credit Report | $35.00 |
| 805 | Lender Fee to Lender | $550.00 |
| 806 | Tax Service Fee to Countrywide | $81.00 |
| 807 | Flood Check Fee | $26.00 |
| 901 | Interest from to @ /day ( days) | $1,294.50 |
| 903 | Hazard Insurance Premium | $584.00 |
| 1001 | Hazard Insurance | $48.67 |
| 1004 | County Property Taxes | $898.38 |
| 1108 | Title Insurance to AAA Title Agency | $935.00 |
| 1201 | Recording Fee | $61.00 |
| 1203 | State tax/stamps | $2,775.00 |

322     Debtor is unable to determine whether or not the above fees are valid in accordance with the

323     restrictions provided by the various consumer protection laws. Therefore, please provide; a

324     complete billing from each vendor who provided the above listed services; the complete contact

325     information for each vendor who provided a billed service; clearly stipulate as to the specific

326     service performed; a showing that said service was necessary; a showing that the cost of said

327     service is reasonable; a showing of why said service is not a regular cost of doing business that

328     should rightly be included in the finance charge.

329     The above charges are hereby disputed and deemed unreasonable until such time as said charges

330     have been demonstrated to be reasonable, necessary, and in accordance with the limitations and

331     restrictions included in any and all laws, rules, and regulations intended to protect the consumer

332     .

333     In the event lender fails to properly document the above charges, borrower will consider same as

334     false charges. The effect of the above amounts that borrower would pay over the life of the note

335  will be an overpayment of $65,542.36. This amount will be reduced by the amount of items
336  above when said items are fully documented.

337    ***RESPA PENALTY***

338  From a cursory examination of the records, with the few available, the apparent RESPA
339  violations are as follows: Good  Faith Estimate not within limits, No HUD-1 Booklet, Truth In
340  Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
341  presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
342  No 1st Payment Letter.

343   The closing documents included no signed and dated :  Financial Privacy Act Disclosure; Equal
344  Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
345  statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
346  disclosure letter; loan discount fee disclosure; business insurance company arrangement
347  disclosure; notice of right to rescind.

348  The courts have held that the borrower does not have to show harm to claim a violation of the
349  Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance.  And,
350  in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
351  no more than two thousand, considering the large number enumerated here, it is reasonable to
352  consider that the court will assess the maximum amount for each violation.

353  Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
354  the note, borrower has calculated that, the number of violations found in a cursory examination
355  of the note, if deducted from the principal, would result in an overpayment on the part of the
356  borrower, over the life of the note, of $152,881.45.

357  If the violation penalty amounts for each of the unsupported fees listed above are included, the
358  amount by which the borrower would be defrauded is $204,903.84

359  Adding in RESPA penalites for all the unsupported settlement fees along with the TILA/Note
360  variance, it appears that lender intended to defraud borrower in the amount of $423,327.65.

361    ***LENDER CONSPIRED WITH APPRAISER***

362  Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
363  purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
364  duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          13 of 26

365  inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
366  Petitioner.

367   ***LENDER CONSPIRED WITH TRUSTEE***

368  Lender conspired with the trust Agent at closing to create a condition of stress for the specific
369  purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
370  fully understand what was being signed.

371  The above referenced closing procedure was a carefully crafted connivance, designed and
372  intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
373  to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
374  did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
375  as required by various consumer protection statutes.

376   ***DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES***

377  In the manner in which Defendants have carried on their business enterprises, they have engaged
378  in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
379  (Deceptive Practices Act).

380  Such conduct comprises a pattern of business activity within the meaning of such statutes, and
381  has directly and proximately caused Petitioner to suffer economic and non-economic harm and
382  detriment in an amount to be shown according to proof at trial of this matter.

383   ***EQUITABLE TOLLING FOR TILA AND RESPA***

384  The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
385  Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

386  Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
387  *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
388  are subject to a one-year limitations period; however, such claims are subject to the equitable
389  tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
390  subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
391  that given the remedial purpose of TILA, the limitations period should run from the date of
392  consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        14 of 26

393   circumstances, suspend the limitations period until the borrower discovers or has reasonable
394   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
395   *v. California, 784 F.2d 910, 915 9*th Cir. 1986).

396   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
397   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
398   that such limitations period may be equitably tolled. The Court of Appeals for the District of
399   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
400   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
401   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
402   *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
403   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
404   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
405   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
406   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
407   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
408   of precedential value, this Court has previously found both the TILA and **RESPA** limitations
409   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
410   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

411   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
412   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
413   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
414   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
415   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
416   any wrongful conduct by the Defendants. Santa Maria. at 1178.

417   ## *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
418   ## *STANDARDS*

419   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
420   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
421   evidencing title, employment information, and other information and documentation that could
422   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
423   ability to repay a particular loan over both the short and long term. Defendants deviated from and

424   disregarded these standards, particularly with regard to its riskier and more profitable loan
425   products.

**Low-Documentation/No-Documentation Loans.**

427   Driven by its desire for market share and a perceived need to maintain competitiveness with the
428   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
429   documentation loan products, including the HARMs and HELOCs described hereinabove, and
430   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
431   the already eased underwriting standards to the point of disregarding such standards. This
432   quickened the loan origination process, allowing for the generation of more and more loans
433   which could then be resold and/or securitized in the secondary market.

434   Defendants marketed no-documentation/low-documentation loan programs that included
435   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
436   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
437   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
438   was to be roughly consistent with incomes in the types of jobs in which the borrower was
439   employed. When borrowers were requested to document their income, they were able to do so
440   through information that was less reliable than in a full-documentation loan.

441   For stated income loans, it became standard practice for loan processors, loan officers and
442   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
443   income loans, emphasizing loan origination from a profitability standpoint at the expense of
444   determining the ability of the borrower to repay the loan from an underwriting standpoint,
445   encouraged the overstating and/or fabrication of income.

**Easing of Underwriting Standards**

447   In order to produce more loans that could be resold/securitized in the secondary mortgage
448   market, Defendants also relaxed, and often disregarded, traditional underwriting standards used
449   to separate acceptable from unacceptable risk. Examples of such relaxed standards was reducing
450   the base FICO score needed for a SISA loan.

451   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
452   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of

453   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
454   income ratios (the amount of monthly income compared to monthly debt service payments and
455   other monthly payment obligations.

456   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
457   term financial circumstances,  approving the loan based on the initial fixed rate without taking
458   into account whether the borrower could afford the substantially higher payment that would
459   inevitably be required during the remaining term of the loan.

460   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
461   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
462   rather than on the borrower's ability to. afford the subsequent, fully amortized principal and
463   interest payments.

464   As Defendants pushed to expand market share, they eased other basic underwriting standards.
465   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
466   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. In each case, the higher the
467   ratio the greater the risk that the borrower will default.

468   Defendants knew, or in the exercise of reasonable care should have known, from its own
469   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
470   loans that were likely to end up in default. However, as the pressure mounted to increase market
471   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
472   underwriting guidelines. Such was the environment that loan officers and underwriters were,
473   from time to time, placed in the position of having to justify why they did not approve a loan that
474   failed to meet underwriting criteria.

475   **Risk Layering**

476   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
477   loans with one or more relaxed underwriting standards.

478   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
479   would increase the likelihood of default. Among the risk layering Defendants engaged in were
480   approving HARM loans with little to no down payment, little to no documentation, and high

481  DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
482  the loans it promoted to borrowers.

483  Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
484  mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
485  believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
486  business ignored basic established underwriting standards and acted to mislead the borrower, all
487  to the detriment of the borrower and the consumer of loan products..

488  Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
489  engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
490  business practices described above in paragraphs 30-42 of this Complaint

491  ***UNJUST ENRICHMENT***

492  Petitioner is informed and believes that each and all of the Defendants received a benefit at
493  Petitioner's expense, including but not limited to the following: To the Agent, commissions,
494  yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
495  be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
496  surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
497  resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
498  percentages of payment proceeds, charges, and other "back end" payments in amounts to be
499  proved at trial; To all participants, the expectation of future revenues from charges, penalties and
500  fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

501  By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
502  and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
503  deprived, and is entitled to restitution in the amount of $423,327.65.

504  ***CLAIM TO QUIET TITLE.***

505  Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
506  the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
507  interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
508  and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

509   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
510   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
511   interest in the Subject Property has been rendered void and that the Defendants are not the holder
512   in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
513   involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

514   "a Petitioner is entitled to damages from those Defendants who concur in the tortious
515   scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
516   *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
517   *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
518   *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
519   *Rptr. 2d 752 (2d Dist. 1995).*

520   ## *SUFFICIENCY OF PLEADING*

521   Petitioner has sufficiently pled that relief can be granted on each and every one of the
522   Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
523   doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
524   entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
525   allegations of material fact in the complaint are taken as true and construed in the light most
526   favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

527   Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
528   8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
529   theories, and seeks remedies to which Petitioner is entitled.   *Balistreri v. Pacifica Police Dept., 901 F.2d*
530   *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
531   conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
532   should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
533   Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
534   their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
535   relief as requested herein should be granted.

## CAUSES OF ACTION

536

### *BREACH OF FIDUCIARY DUTY*

537

538  Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
539  duty of care with respect to the mortgage loan transactions and related title activities involving
540  the Trust Property.

541  Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
542  breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
543  all applicable laws governing the loan transactions in which they were involved, including but
544  not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

545  Defendant's breaches of said duties was a direct and proximate cause of economic and non-
546  economic harm and detriment to Petitioner(s).

547  Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
548  all to be shown according to proof at trial of this matter.

### *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

549

550  Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
551  duty to properly perform due diligence as to the loans and related transactional issues described
552  hereinabove.

553  In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
554  X and Z promulgated there under to, among other things, provide proper disclosures concerning
555  the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
556  or should have known that borrowers could  not afford or maintain, and to avoid paying undue
557  compensation such as "yield spread premiums" to mortgage Agents and loan officers.

558  Defendants knew or in the exercise of reasonable care should have known, that the loan
559  transactions involving Petitioner and other persons similarly situated were defective, unlawful,
560  violative of federal and state laws and regulations, and would subject Petitioner to economic and
561  non-economic harm and other detriment.

562  Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
563  Z promulgated there under were intended and designed to protect, and the conduct alleged

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          20 of 26

564   against Defendants is the type of conduct and harm which the referenced statutes and regulations
565   were designed to deter.

566   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
567   non-economic harm in an amount to be shown according to proof at trial.

568   ***AGENT: COMMON LAW FRAUD***

569   If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
570   negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
571   ground for believing them to be true.

572   Agents made these representations with the intention of inducing Petitioner to act in reliance on
573   these representations in the manner hereafter alleged, or with the expectation that Petitioner
574   would so act.

575   Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
576   in their negligent misrepresentation, and that various Agents were negligent in not implementing
577   procedures such as underwriting standards oversight that would have prevented various Agents
578   from facilitating the irresponsible and wrongful misrepresentations of various Agents to
579   Defendants .

580   Petitioner is informed and believes that Agent acted in concert along with other others named
581   herein in promulgating false representations to cause Petitioner to enter into the LOAN without
582   knowledge or understanding of the terms thereof.

583   As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
584   Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
585   opportunities, attorney fees and costs, and other damages to be determined at trial. As a
586   proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
587   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
588   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
589   at trial.

590     ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
591     ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

592     Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
593     fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
594     performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
595     *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
596     *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
597     *Jones, (2004) 33 Cal. 4th 917,* the court stated:

598     In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
599     particular significance, in part because of the special relationship between the insurer and the
600     insured. The insurer, when determining whether to settle a claim, must give at least as much
601     consideration to the welfare of its insured as it gives to its own interests. . . The standard is
602     premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

603     Likewise, there is a special relationship between a Agent and borrower. "A person who provides
604     Agentage services to a borrower in a covered loan transaction by soliciting Lenders or otherwise
605     negotiating a consumer loan secured by real property, is the fiduciary of the consumer...this
606     fiduciary duty [is owed] to the consumer regardless of whom else the Agent may be acting as an
607     Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in *good faith.* If the
608     *Agent knew or should have known that the Borrower will or has a likelihood of defaulting ... they*
609     *have a fiduciary duty to the borrower not* to place them in that loan." (California Department of
610     Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov). [*Emphasis Added*].

611     All Defendants, willfully breached their implied covenant of good faith and fair dealing with
612     Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
613     provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
614     product without regard for other more affordable products; (4) Placed Petitioner into a loan
615     without following proper underwriting standards; (5) Failed to disclose to Petitioner that
616     Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
617     valid and /or properly documented substitutions and assignments so that Petitioner could
618     ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
619     request for documentation of the servicing of Petitioner's loan and the existence and content of
620     relevant documents. Additionally, Defendants breached their implied covenant of good faith and

621    fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the

622    right under an alleged power of sale because the purported assignment was not recorded and by

623    willfully and knowingly financially profiting from their malfeasance. Therefore, due to the

624    special relationship inherent in a real estate transaction between Agent and borrower, *and* all

625    Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

626    ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***

627    ***SEQ***

628    Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation

629    contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of

630    Action as though the same were set forth herein.

631    This consumer credit transaction was subject to the Petitioner's right of rescission as described

632    by *15 U.S.C. § 1635*(a) and Regulation Z § 226.23 (12 C.F.R. § 226.23).

633    More particularly, the same Defendants violated *15 U.S.C. § 1635*(a) and Regulation Z §

634    226.23(b) with regards to the purported Notice of Right to Cancel. As a consequence of this

635    action, the Notice of Right to Cancel documentation was not provided to Petitioner or if

636    furnished, to Petitioner it failed to: Correctly identify the transaction, Clearly and conspicuously

637    disclose the Petitioner's right to rescind the transaction three days after delivery of all required

638    disclosures, Clearly and conspicuously disclose how to exercise the right to rescind the

639    transaction, with a form for that purpose, Clearly and conspicuously disclose the effects of

640    rescission, Clearly and conspicuously disclose the date the rescission period expired.

641    Petitioner is informed and believes that Defendants's violation of the provisions of law rendered

642    the credit transaction null and void, invalidates Defendants's claimed interest in the Subject

643    Property, and entitles Petitioner to damages as proven at trial.

644    ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

645    The conduct committed by Defendants, driven as it was by profit at the expense of increasingly

646    highly leveraged and vulnerable consumers who placed their faith and trust in the superior

647    knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by

648    civilized society.

649   Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
650   distress, or acted in conscious and/or reckless disregard of the probability that such distress
651   would occur.

652   Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
653   conduct of Defendants as described hereinabove.

654   As a result of such severe emotional distress, Petitioner suffered economic and non economic
655   harm and detriment, all to be shown according to proof at trial of this matter.

656   Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
657   Petitioner and secure to Petitioner quite title;

658   Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
659   as payments to Defendants based on the fraudulently secured promissory note in an amount to be
660   calculated by Defendants and verified to Petitioner;

661   Petitioner further demands that Defendants pay to Petitioner an amount equal to trebel the
662   amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
663   equal to $1,034,131.35

664                                                **PRAYER**

665   WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
666   as follows:

667          For an emergency restraining order enjoining lender and any successor in interest from
668          foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
669          herein;

670          For a permanent injunction enjoining Defendants from engaging in the fraudulent,
671          deceptive, predatory and negligent acts and practices alleged herein;

672          For quiet title to Property;

673          For rescission of the loan contract and restitution by Defendants to Petitioner according
674          to proof at trial;

675          For disgorgement of all amounts wrongfully acquired by Defendants according to proof
676          at trial;

677          For actual monetary damages in the amount of $423,327.65;

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        24 of 26

678   For pain and suffering due to extreme mental anguish in an amount to be determined at
679   trial.

680   For pre-judgment and post-judgment interest according to proof at trial;

681   For punitive damages according to proof at trial in an amount equal to $1,269,982.95;

682   For attorney's fees and costs as provided by statute; and,

683   For such other relief as the Court deems just and proper.

684   **Respectfully Submitted,**
685
686
687   **Christopher  Campanella**

688
689

690

691

692                         **VERIFICATION**

693

694

695    I, Christopher   Campanella , do swear and affirm that all statements made herein are true and
696    accurate, in all respects, to the best of my knowledge.

697    Christopher   Campanella
698    309 Phillips Road
699    Valley Falls  NY 12185
700    Phone: 858 217 3384
701

702    SWORN  TO  AND  SUBSCRIBED  BEFORE  ME, *Erin P. Vestal*, by *Christopher*
703 *Campanella* on the ___11___ day of _*June*_____, 2010, which witnesses my hand and seal of office.

704

705

706                  **NOTARY PUBLIC IN AND FOR**

707                  **THE STATE OF NEW YORK**

ERIN P. VESTAL
Notary Public, State of New York
Qual. in Albany Co. No. 02VE6145947
Commission Expires May 15, 20_14_

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          26 of 26